**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SUDIE M. GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| | ) | |
| MARK S. DIAMOND; UNITED RESIDENTIAL | ) | |
| SERVICES & REAL ESTATE, INC.; | ) | |
| AMERICAN  FIDELITY FINANCIAL | ) | |
| SERVICES, INC.; GARY THOMAS BOHN; | ) | |
| DENNIS BOTH; PRIMARY TITLE SERVICES, | ) | |
| LLC INC.; URBAN FINANCIAL GROUP, | ) | |
| INC.; SHAUN DONOVAN, Secretary, U.S. | ) | |
| Department of Housing and Urban Development, | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HOUSING & URBAN DEVELOPMENT, | ) | |
| MORTGAGE ELECTRONIC REGISTRATION | ) | |
| SYSTEMS, INC.; and UNKNOWN ASSIGNEES, | ) | **JURY DEMANDED** |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

## INTRODUCTION

1. Plaintiff, Sudie M. Green, a/k/a Sadie Green ("Ms. Green"), brings this action against a reverse mortgage lender, a title company, a mortgage broker, a home repair contractor, and others, seeking to rescind a mortgage pursuant to the Truth in Lending Act, and to secure redress for consumer fraud, discrimination, and other predatory practices.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction under the federal Truth in Lending Act, 15 U.S.C. §1601 *et seq.*  and the Civil Rights Act, 42 U.S.C. § 1981.  The Court has supplemental jurisdiction over plaintiff's state-law claims pursuant to 28 U.S.C. §1367.

3.      All defendants transact business in the District and/or reside here, and the transactions at issue occurred here. Therefore venue is appropriate in this District.

## PARTIES

4.      Sudie Green is an 85-year-old widow who lives on a fixed income in a home that she owns at 741 N. Lockwood in Chicago.

5.      Defendant Mark S. Diamond ("Diamond") is an individual residing in Chicago, Illinois.  He is a formerly licensed mortgage broker and currently operates as a home improvement contractor.  Diamond is the President and Secretary of United Residential Services & Real Estate, Inc. ("United"), and acted on its behalf in all dealings with plaintiff.  He may be found either at United's address at 2355 North Damen, Chicago, Illinois 60647, or at 360 East Randolph Street, #3604, Chicago, Illinois 60601.

6.      Defendant United Residential Services & Real Estate, Inc. ("United") is an Illinois corporation, with principal offices at 2355 N. Damen Avenue in Chicago.  United is or was a home repair and remodeling contractor and general contractor.  Its registered agent is attorney Dennis Both, whose law office address is 1332 N. Halsted, Suite 100, Chicago, Illinois 60642, but who is listed in the Corporations registry as being located for service of process at United's business address.

7.      Defendant American Fidelity Financial Services, Inc. ("American Fidelity") is an Illinois corporation currently not in good standing.  American Fidelity is an Illinois residential mortgage licensee engaged in the business of a mortgage broker, with offices located at 1030 W. Higgins Road, Suite 104, Hoffman Estates, IL 60169. Its registered agent is Steven L Garcia, 5001 Newport Drive, Rolling Meadows, Illinois 60008.

8. Defendant Gary Thomas Bohn is a registered mortgage loan originator employed by American Fidelity. He personally participated in the fraudulent transaction as set forth below.

9. Defendant Dennis Both is an Illinois licensed attorney. He has been counsel to Mark Diamond for many years and personally participated in the fraudulent conduct as set forth in detail below.

10. Defendant Primary Title Services, LLC ("Primary Title"), is a title company located at 8833 Gross Point Road, #205, Skokie, Illinois 60077, engaged in the business of a title insurance agency. The president and registered agent of Primary Title is Sharon Roos Kirkpatrick, 9634 Tripp Ave., Skokie, Illinois 60076. Primary Title was the lender's closing agent in plaintiff's reverse mortgage transaction.

11. Defendant Urban Financial Group, Inc. ("Urban") is an Oklahoma corporation doing business in Illinois. Urban is a reverse mortgage lender, with principal offices located at 8909 S. Yale Avenue, Tulsa, Oklahoma 74137. Urban also does business in Illinois and other states under the name "Reverse It!" Its Illinois registered agent is National Registered Agents Inc., 200 West Adams Street, Chicago, Illinois 60608. Urban is the originating lender and record mortgagee of plaintiff's mortgage that is the subject of this action.

12. The United States Department of Housing and Urban Development (HUD) is a record holder of the subject mortgage on plaintiff's property, and is therefore named as a necessary party.

13. Shaun Donovan ("Donovan") is Secretary of HUD, and is named in his official capacity only.

14. Mortgage Electronic Registration Systems Inc. ("MERS"), is a Delaware corporation doing business in Illinois, with corporate headquarters located at 1818 Library Street, Suite 300,

3

Reston, Virginia. MERS' registered agent in Illinois is Genpact Registered Agent Inc., located at 1901 E. Voorhees Street, Suite C, Danville, Illinois 61834. MERS is a record holder of the subject mortgage on plaintiff's property, and is therefore named as a necessary party.

15.     Defendants "Unknown Assignees" are any other or additional entities that have acquired, or may during the pendency of this lawsuit acquire, any interest in the plaintiff's mortgage loan. Transfer of ownership interests in mortgage loans is not necessarily a matter of public record. Plaintiff will learn through discovery whether there are any additional parties with interests in plaintiff's loan.

**FACTS RELATING TO MARK DIAMOND'S ONGOING SCHEME**

16.     As described in greater detail herein, Diamond is involved in an ongoing scheme with mortgage brokers, title agencies, a housing counselor, and his attorney who acts as the loan closing agent/notary.

17.     Mark Diamond has repeatedly engaged in a pattern and practice of fraudulently offering to perform home improvements, then arranging for the financing of those improvements, intending to obtain and obtaining the maximum available mortgage loan proceeds without performing a commensurate amount of work.

18.     Diamond and his companies have been sued numerous times in state and federal court by individual homeowners, the Illinois Attorney General, the Federal Trade Commission, and others for misconduct very similar to that which plaintiff alleges in this case. Past allegations have included fraud, racial targeting, and taking money from customers to do home repairs but doing little, no, or substandard work.

19.     Over the past fifteen years, numerous consumers similar to the plaintiff in this case have filed complaints against Diamond in court and with federal, state, and local consumer protection

agencies.  *See, e.g.*, *Chavarin v. Diamond, et al*., 96 CH 04727 (Circuit Court of Cook County) (plaintiffs alleged that Diamond made misrepresentations, forged a check, and kept loan proceeds that were intended for the borrowers); *Hopson v. Diamond, et al.,* 00 C 5061 (N.D. Ill.) (elderly disabled woman alleged Diamond engaged in a fraudulent home improvement and lending scheme and fraudulently induced her to transfer property title to him);  *Blackwell v. Diamond, et al.*, 00 CH 06089 (Circuit Court of Cook County) (plaintiff alleged that after she refused to execute a mortgage with her husband, Diamond conspired with her husband to take her name off the title by means of forgery in order to fraudulently obtain the mortgage); *Thomas v. Diamond, et al*., 2001 CH 01958 (Circuit Court of Cook County) (plaintiff alleged that Diamond promised to arrange certain home repairs and instead forged a deed transferring title to Diamond); *First Union Home Equity v. Willis v. Diamond, et al*., 2001 CH 07000 (Circuit Court of Cook County) (elderly disabled homeowner in foreclosure alleged that Diamond and affiliated companies fraudulently solicited home improvements and a mortgage loan that the homeowner could not afford by deceiving him about the actual costs); *Harris v. Diamond*, *et al.*, 07 C 3552 (N.D. Ill.) (longtime homeowners alleged that Diamond fraudulently arranged a $354,000 mortgage, took $163,000 for home repairs, then gutted the property, demanded more money, required plaintiffs to obtain a mortgage in the amount of $500,000, and violated the Truth in Lending Act and other consumer protection statutes); *Smith v. United Residential Services, et al.*, 10 C 5440 (N.D. Ill.); *Buckner v. Urban Financial Group, et. al.*, 11 C 4686 (N.D. Ill.) (alleging facts and parties virtually identical to this action); *Walton v. Diamond*, *et. al.*, 12 C 4493 (N.D. Ill.) (same).

20.     In 2002, Diamond was sued in a joint action by the Federal Trade Commission and the Illinois Attorney General for similar deceptive conduct in *FTC v. OSI Financial Services, Inc. et.*

*al.*, 02 C 5078 (N.D. Ill.). In that case, on or about December 2, 2003, Diamond agreed to the entry of a consent decree which provided that Diamond and his companies were permanently enjoined from making misrepresentations about the terms or costs of loans, including misrepresentations concerning the amount of cash disbursed from mortgage loans for home improvements, and from conducting any loan closings. Diamond's conduct in the transaction which is the subject of this action violated the terms of the consent decree, in that he made misrepresentations about the terms and costs of the loan.

21.     On or about October 24, 2008, the Illinois Department of Financial and Professional Regulation revoked the mortgage broker's license of Diamond's brokerage, OSI Financial, as a result of numerous consumer complaints of fraudulent conduct.    Nonetheless, Diamond continues to offer financing to his home repair customers even after losing his brokerage's license.

22.     On September 15, 2009, the Illinois Attorney General filed a complaint for an injunction against Diamond.   The case is currently pending in the Circuit Court of Cook County.   The complaint alleges that Diamond, OSI (his former mortgage brokerage), United, and various other Diamond affiliates have committed mortgage and home repair and remodeling fraud.   At least 36 consumers have filed complaints against defendants with the Illinois Attorney General in connection with this action.   *People of the State of Illinois v. Diamond, et al*., 2009 CH 33398 (Circuit Court of Cook County).

23.     The Attorney General's complaint further alleges that Diamond defrauds consumers by misrepresenting their rights, informing them that they cannot use their loan proceeds to hire other home repair companies, and retaining funds intended for repairs.   Diamond's conduct locks the consumers into home repair contracts with Diamond and his affiliates.   The written contracts,

where they exist, do not fully specify the work to be done, do not itemize the cost of the work and the types of materials to be used, or specify the disbursement of loan proceeds. Furthermore, the AG's complaint alleges, Diamond and his affiliates do not complete performance of the contract, and the work done is shoddy and unprofessional. See *People v. Diamond, et al.*, 2009 CH 33398 (Circuit Court of Cook County).

24.     Diamond's conduct in the transaction which is the subject of this action is similar to the conduct alleged in the Illinois Attorney General's Complaint and the other actions cited above.

25.     Diamond and the companies he controls have a decades-long pattern and practice of targeting minority homeowners (especially elderly, African-American homeowners on the west side of Chicago), soliciting them in person through deceptive door-to-door sales techniques for mortgage products and overpriced home repair work that they do not need or cannot afford, and then doing incomplete, shoddy and defective work.

26.     The common actor in all of these separate transactions and schemes, whenever they are perpetrated and under whatever company name, is Mark S. Diamond.

27.     Diamond formulated, directed, controlled, managed, actively participated in the day-to-day activities and at all times had knowledge of the acts and practices of defendant United and other entities under his control, including the fraudulent conduct described herein. Therefore, he is personally liable for his own tortious fraudulent conduct, even if he used a corporate entity to create the purported home repair contract with plaintiff.

28.     Diamond was and is United's alter ego. There was and is a unity of interest between United and Diamond. On information and belief, Diamond does not observe the customary corporate formalities, has not issued stock or paid dividends, is inadequately capitalized, and is

insolvent or nearly insolvent.  Moreover, Diamond regularly commingles funds belonging to his various entities with each other and with his personal funds.

29.     In fact, United is a mere façade for the operations of Mark Diamond as an individual.

30.     Under these circumstances, to adhere to the fiction of separate existence of United and Diamond would serve to sanction fraud and to promote unjust and inequitable consequences.

## FACTS RELATING TO MULTIPLE COUNTS

31.     Plaintiff Sudie Green has lived in her home for over forty years.  The property is a two-flat apartment building.

32.     At the time of the subject transaction, Ms. Green owned her home free and clear of all liens and mortgages.

33.     In 2012, Ms. Green needed some minor repairs done on the property, including repairing a leaky roof, replacing gutters, and repairing the back porch stairs.

34.     In or around early April 2012, a young African-American woman named Cynthia knocked on Ms. Green's door, and explained that she represented a company which "helps senior citizens" get work done on their homes, and stated, "You won't have to pay anything."

35.     A few days later, Mark Diamond visited Ms. Green's home, and while he was there, a woman named Hope joined him.  Diamond explained all the things they do for seniors, and began pointing out various things around the house, inside and out, that could be repaired or remodeled.  Among the things Diamond suggested was to remodel the first floor kitchen, fix the gutters in front, repair the back stairs, remodel the entire second floor, and repair the chimney. Diamond did not write any of this information down during his visit, and Ms. Green did not sign any documents that day.

36.     Diamond stated that these repairs would not cost Ms. Green anything because there was a special "government program for seniors" to pay for all of them.

37.     Ms. Green was familiar with the Weatherization Program, which is a federally funded program to provide free energy-efficient home improvements for low-income homeowners, such as new windows and furnaces.  Therefore, she reasonably believed that Diamond was referring to a similar program of free home repairs for elderly homeowners.

38.     In fact, Diamond intended to arrange for Ms. Green to obtain a reverse mortgage.  A reverse mortgage is a loan secured by the borrower's primary residence, pursuant to which no payments need to be made as long as the borrower resides in the home.  Such loans are available to senior citizens over age 62, and the amount available is based on the appraised equity value of the property rather than the credit standing of the borrower.

39.     Prior to soliciting Ms. Green's business, Diamond researched her property and learned that she owned it free and clear, and thus, that there was substantial home equity available through a reverse mortgage.

40.     Shortly before April 13, 2012, Diamond arrived at Ms. Green's home with Gary Bohn, a loan originator working for American Fidelity.  Diamond identified Bohn as his broker, and it appeared to Ms. Green that Gary worked for Diamond.  They took Ms. Green's information for an application for a reverse mortgage.  Ms. Green signed some documents that day, but cannot state with specificity what she signed or exactly when she signed the documents.

41.     Diamond asked Ms. Green for her State of Illinois identification card, Social Security card, her marriage license, and husband's death certificate (he died in 1993).  Most of Ms. Green's identification documents were in her maiden name, Clark, and Diamond told her that she

would need to change those documents to her married name of Green in order to proceed with the program.

42.    When Ms. Green did not act immediately to change her identification documents, Diamond's associate, Hope, came to her home and took Ms. Green to the Secretary of State's office to have her state identification card changed, in late May, 2012.

43.    Diamond also arranged for Sharon Roos Kirkpatrick, the owner of Primary Title, to draft a deed transferring record title to the property from "Sadie Green A/K/A Sudie Green" to Sudie Green.  Ms. Green apparently signed this deed on or about May 30, 2012, and her signature was notarized by Diamond's attorney, Dennis Both.  Ms. Green is unfamiliar with real estate transactions and did not understand she was signing a deed at that time.  Kirpatrick received $100 from the loan proceeds for preparing this deed.

44.     On or about June 1, 2012, Diamond returned to Ms. Green's home with another man who "worked with" him, and she signed documents relating to a reverse mortgage.  On information and belief, the other man was Diamond's attorney Dennis Both, who later dated and notarized the mortgage loan documents.

45.    Diamond and Dennis Both did not explain any of the documents to Ms. Green, but at one point they informed her that she was getting $133,000 and asked if she wanted these funds in a lump sum. She said yes.

46.    Diamond and Dennis Both did not give Ms. Green copies of the documents she signed in connection with the reverse mortgage.  No one orally informed Ms. Green that she had the right to cancel the whole transaction without cost within three days.  No one explained or pointed out the Notice of Right To Cancel document when she was signing the numerous pages.

47.    Ms. Green did not receive copies of any of the loan documents, including any Truth In Lending disclosures or the Notice of Right to Cancel required by TILA.

48.    Diamond never told Ms. Green how much the home repairs would cost, and she does not have a copy of any contract for construction work on her home.  She does not recall signing any agreement for specific home repairs or construction work.

49.    Diamond did not give Ms. Green a copy of the Home Repair – Know Your Rights disclosures, which are required under the Illinois Home Repair and Remodeling Act.  That brochure, produced by the Illinois Attorney General's Office, recommends (among other things) that a consumer should not make a final, full payment for home repairs until the work is completely done to the consumer's satisfaction.

50.    Diamond did not tell Ms. Green that he required payment in full for all repairs in advance of any work being done, although that was his policy and practice.

51.    On or about June 7, 2012, Primary Title disbursed the loan proceeds, including issuing a check payable to Ms. Green in the amount of $122,239.30.

52.    Mark Diamond and/or others acting at his direction, obtained the loan proceeds check without Ms. Green's knowledge or consent.

53.    Instead of having the lender or title company deliver the loan check directly to Ms. Green, Diamond conspired with Gary Bohn, Dennis Both, and/or someone else at Primary Title, to give Diamond the loan proceeds check.

54.    Ms. Green did not receive any proceeds from the reverse mortgage, and did not authorize the lender or its agent to give her loan proceeds to anyone else.

55.    Ms. Green did not receive the check, did not give the check to anyone, and did not endorse the back of the check for deposit.

56.     This check was deposited into a business account at North Bank controlled and owned by Mark Diamond under the name of United.

57.     On information and belief, based on a longstanding pattern and modus operandi, Diamond and/or Dennis Both created or caused to be created a fictitious letter of direction to the lender, directing that the loan proceeds check be delivered to him or his company, or to the broker (Gary Bohn), instead of to Ms. Green.

58.     On information and belief, based on a longstanding pattern and modus operandi, Diamond waited for the loan to be approved to learn how much the proceeds would be, and then created a purported home repair contract for the entire amount of Ms. Green's "cash out" loan proceeds, in excess of $122,000, dated the same day as the reverse mortgage.  Ms. Green never received a copy of any construction contract.

59.     On information and belief, based on a longstanding pattern and modus operandi, Mark Diamond had no intention of completing the improvements as promised.

60.     Reverse mortgage lenders often require certain repairs be done as a condition of making the loan, and will hold back some of the loan funds in order to do so.  In this case, the lender did not require any home repairs to be done as a condition of the reverse mortgage loan, suggesting that the property was in good condition and was not in need of $122,000 in repairs.

61.     On or about June 20, 2012, a mortgage dated June 1, 2012, in the amount of $267,000, was recorded in the office of the Cook County Recorder of Deeds as Document No.1217245044. The mortgage was against plaintiff's property and in favor of Urban Financial Group.

62.     The mortgage was notarized by Dennis Both, who has represented Mark Diamond for many years in various litigation and business matters.  Dennis Both has acted as a lender's closing agent in numerous transactions with Diamond's customers and has notarized dozens of

mortgage and property title documents for victims of Diamond's long-running home repair and equity-skimming scheme.

63.    At the time of this transaction, Dennis Both was well aware that numerous consumers had previously complained that Diamond had taken all of their loan proceeds and failed to perform as promised.

64.    At the time of this transaction, Dennis Both was well aware that that numerous consumers had previously complained that Diamond had obtained their loan proceeds without their knowledge or consent.

65.    At the time of this transaction, Dennis Both was well aware that Diamond had a pattern and practice of taking all the money upfront before any work was done, contrary to the Attorney General's advice contained in the Home Repair – Know Your Rights brochure.

66.    The remodeling work did not begin immediately.  Ms. Green called Diamond several times asking him to come start the work.  He scheduled dates and then did not show up when he said he would.  Finally, in late summer of 2012, Diamond had workers or a subcontractor remodel two bathrooms in Ms. Green's home.

67.    In the two bathrooms, Diamond had workers or a subcontractor remove and replace some drywall, and install new floor tile, bathtubs, a vanity, and toilets.  The fixtures are not of particularly high grade or quality; the work is sloppy.  In one of the bathrooms, the shower head broke off and Ms. Green had to hire someone else to replace it.  In the other bathroom, the sliding shower door is defective and dangerous.

68.    After the two bathrooms were done, Diamond and his workers or subcontractors never returned to perform any further improvements.  Ms. Green called Diamond several more times, leaving messages with his office inquiring when the rest of the work would be done.

69.     When Diamond finally returned her calls, he told Ms. Green that the remaining work was being delayed because he was short-staffed and was having trouble getting building permits from the City of Chicago.  However, on information and belief, based on a search of the City's building department website, Diamond never applied for any building permits for Ms. Green's home repairs.  In addition, Diamond does not use his own employees to perform any home repairs, so the statement that he was "short-staffed" was also false.

70.     In December 2012, a storm window broke in Ms. Green's home.  She called Diamond and asked if he could repair it.  Diamond came to the house to inspect the window, and stated that he would be back in a couple of days to have it fixed.  No one ever came back to do so.

71.     In or around April 2013, Ms. Green received a call from Diamond's associate, Cynthia, who asked whether she had spoken with Diamond recently, and whether he had been over to do any further work on the house.  Cynthia also asked Ms. Green if she had received any money from the mortgage.  Ms. Green responded, "No."  Cynthia then said she had some forms for Ms. Green to fill out.

72.     Cynthia told Ms. Green that they had a check for her in the amount of $50,000 from the reverse mortgage.  However, Cynthia said that Ms. Green would have to give her $300 first in order to get this check, and offered to send someone to her home to pick up the $300.

73.     Ms. Green thought that Cynthia's demand did not sound right and did not agree to give Cynthia $300.

74.     Ms. Green did not see Diamond again until he appeared unannounced at her home with three workers in August 2013, stating that they were there to do some work on the house.  By that time, more than a year after the original transaction date, Ms. Green no longer trusted Diamond and refused to let him into her home.

75.     Diamond received over $122,000 for remodeling two bathrooms and nothing else. The transaction has resulted in a large encumbrance on Ms. Green's property, effectively stripping all of the equity out of the home and depriving Ms. Green's children of their inheritance.

76.     American Fidelity and Gary Bohn received over $10,000 in compensation for originating the subject loan.

77.     Interest and fees are accruing on the reverse mortgage loan at more than $6,000 per year.

78.     On information and belief, based on average property values in the Austin neighborhood of Chicago and counsel's estimated value of the property, compared with the size of the loan given to Ms. Green, the subject property was intentionally over-appraised in order to strip the maximum amount of equity.  Because Ms. Green does not have copies of the appraisal or the actual loan documents, plaintiff cannot specifically quantify the magnitude of the over-appraisal.

79.     The only documents Ms. Green received in connection with the mortgage are preliminary "Good Faith Estimates" and sample loan documents from American Fidelity dated April 13, 2012, and a copy of the loan agreement received from HUD shortly after June 1, 2012. Plaintiff's counsel obtained a copy of the mortgage from the Recorder of Deeds. Much later, Plaintiff's counsel also received a copy of the purported Notice of Right to Cancel and the loan proceeds check, along with other documents from Primary Title and Urban Financial Group.

80.     This whole ordeal has caused Ms. Green actual damages, including lost home equity in excess of $100,000, plus extreme emotional distress, aggravation and inconvenience.

## COUNT I  --  TRUTH IN LENDING ACT

81.     This Count is brought against Urban Financial Group, MERS, Donovan and HUD only.

82.     Plaintiff incorporates paragraphs 1-80 above by reference herein. Urban Financial Group regularly extends or offers to extend consumer credit for which a finance charge may be imposed

or which is payable in four or more installments, and thus is a creditor within the meaning of TILA, 15 U.S.C. § 1602(f) and Regulation Z. §226.2(a)(17).

83.     The transaction at issue was entered into for personal, family, or household purposes, namely for home improvements.

84.     Because the transaction was secured by plaintiff's home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by TILA, 15 U.S.C. Sect. 1635 and 12 C.F.R. Sect. 226.23.

85.     Ms. Green received no copies of any TILA disclosures or the Notice of Right to Cancel at the time of the loan.

86.      On or about November 4, 2013, Ms. Green by her counsel notified Urban Financial Group and the Department of Housing and Urban Development ("HUD") that she was exercising her extended right to rescind the mortgage pursuant to TILA.

87.     As of the date of filing this action, neither Urban nor HUD has taken any steps to release the recorded mortgages as required by TILA.

88.     Defendants' conduct violates TILA, entitling plaintiff to full rescission of the loan and $4,000 statutory damages for failure to rescind and release the mortgage.

89.     Because the lender's settlement agent gave Ms. Green's loan proceeds to someone else without her authorization, and she did not receive the entire loan proceeds, she is only required to tender back to the lender the amount of the value of the benefit she received, *i.e.*, the value of the work in the two remodeled bathrooms.

            WHEREFORE, Ms. Green prays that this Court enter judgment in her favor and against the defendants, declare that the security interest arising out of the transaction is null and void, and award her actual and statutory damages, attorneys' fees, and costs of suit.

## COUNT II – ILLINOIS CONSUMER FRAUD ACT

90.     Plaintiff incorporates paragraphs 1- 89 above by reference herein.  This count is against

Diamond, United, Both, American Fidelity, Bohn, and Primary Title, only (collectively

"defendants").

91.     Pursuant to the Illinois Home Repair and Remodeling Act, 815 ILCS 513/1 *et. seq.*

("IHRRA"),

> "[i]t is the public policy of this State that in order to safeguard the life, health, property,
> and public welfare of its citizens, the business of home repair and remodeling is a matter
> affecting the public interest. The General Assembly recognizes that improved
> communications and accurate representations between persons engaged in the business of
> making home repairs or remodeling and their consumers will increase consumer
> confidence, reduce the likelihood of disputes, and promote fair and honest practices in
> that business in this State."

92.     The IHRRA provides, *inter alia*, that home repair and remodeling contracts must be in

writing, with costs itemized and enumerated, and requires the contractor to provide a certain

"Know Your Consumer Rights" brochure.  815 ILCS 513/1 *et. seq.*

93.     The IHRRA (815 ILCS 513/30)  provides that "[a]ny person who suffers actual damage

as a result of a violation of this Act may bring an action pursuant to Section 10a of the Consumer

Fraud and Deceptive Business Practices Act.  (815 ILCS 505/10a)

94.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") provides

that

> "Unfair methods of competition and unfair or deceptive acts or practices, including but
> not limited to the use or employment of any deception fraud, false pretense, false
> promise, misrepresentation or the concealment, suppression or omission of any material
> fact, with intent that others rely upon the concealment, suppression or omission of such
> material fact, or the use or employment of any practice described in Section 2 of the
> "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of
> any trade or commerce are hereby declared unlawful whether any person has in fact been
> misled, deceived or damaged thereby. In construing this section consideration shall be

17

given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act."

95.     Pursuant to 16 C.F.R. Part 429 ("FTC Rule"), Federal Regulations provide that

"in connection with any door-to-door sale, it constitutes an unfair and deceptive act or practice for any seller to: (a) Fail to furnish the buyer with a fully completed receipt or copy of any contract pertaining to such sale at the time of its execution . . . which shows the date of the transaction and contains the name and address of the seller, and in immediate proximity to the space reserved in the contract for the signature of the buyer or on the front page of the receipt if a contract is not used and in bold face type of a minimum size of 10 points, a statement in substantially the following form:

"You, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction. See the attached notice of cancellation form for an explanation of this right."
* * *
 (b) Fail to furnish each buyer, at the time the buyer signs the door-to-door sales contract or otherwise agrees to buy consumer goods or services from the seller, a completed form in duplicate, captioned either "NOTICE OF RIGHT TO CANCEL" or "NOTICE OF CANCELLATION," informing the consumer that they "may CANCEL this transaction, without any Penalty or Obligation, within THREE BUSINESS DAYS from the above date."

(e) Fail to inform each buyer orally, at the time the buyer signs the contract or purchases the goods or services, of the buyer's right to cancel."

96.     This FTC Rule further provides that it is an unfair and deceptive act to "[m]isrepresent in any manner the buyer's right to cancel."

97.     Section 2B of the ICFA similarly requires a notice of right to cancel within three days of signing a contract in the consumer's home.

98.     As described above, in the course of his trade or business, Diamond solicited plaintiff and arranged for the reverse mortgage loans through American Fidelity, Bohn, and Urban, and for the home repair and remodeling work contract through United.

99.    Over the course of his personal visits to plaintiff's home before obtaining the reverse mortgages for her, Diamond persuaded plaintiff to agree to much more work than she actually wanted.

100.    Consistent with his *modus operandi* in scores of other transactions, Diamond was so personable and pleasant that plaintiff believed he was going to help her obtain free, government-subsidized home repairs.  He quickly gained her trust and confidence.  He claimed United's remodeling work was top quality.

101.    Consistent with his *modus operandi* in numerous other transactions, Diamond failed to provide plaintiff with copies of written contracts, itemized contracts, and notices of consumer rights.

102.     Ms. Green did not receive a copy of the documents she signed at the time she signed them.

103.    Ms. Green either never signed a home repair contract with Diamond, or if she signed one, she never received a copy and was never orally given a price or estimated cost of the home repairs.

104.    Plaintiff never received a copy of the "Know Your Consumer Rights" brochure that United was required to give her.

105.    Plaintiff never received a written estimate of the cost of construction and repairs, as required by Illinois law.

106.    Plaintiff never received a copy of the notice of right to cancel the construction contract (if she signed one).

107.    Defendants have engaged in the conduct that constitutes unfair and deceptive acts and practices declared unlawful under the Home Repair Remodeling Act, 815 ILCS § 513/15, in that,

in the course of advertising, offering for sale, selling and providing home repair and remodeling services to plaintiff prior to executing of the contract, defendants, on information and belief, failed to, among other things, (a) provide to plaintiff a copy of the "Home Repair: Know Your Consumer Rights" pamphlet prior to the execution of any home repair and remodeling contract; (b) obtain a signed and dated acknowledgment form entitled "Consumer Rights Acknowledgment Form" from plaintiff; and (c) sign and date the acknowledgment form, retain the original, and leave a copy with plaintiff.

108.    As set forth above, defendants obtained substantial sums of money from the reverse mortgage loan without the knowledge or authorization of the plaintiff, at all times intending not to perform as promised.

109.    Dennis Both participated in the unfair and deceptive conduct as a notary and not in his capacity as a lawyer, and therefore is subject to the Consumer Fraud Act for his conduct herein.

110.    Dennis Both engaged in unfair and deceptive conduct in violation of ICFA when he notarized documents and facilitated the execution of fictitious letters of direction, while knowing that Diamond intended to steal the equity in plaintiff's home.

111.    On information and belief, based on documents obtained in other litigation against these defendants, Dennis Both received compensation "paid outside closing" for his services as a notary in excess of the amount of the fees set forth in the loan settlement disbursement statement.

112.    On information and belief, Gary Bohn and Primary Title knowingly participated in the unauthorized delivery of the loan check to Diamond, or they were grossly negligent in allowing him to obtain it.

113.    Defendants engaged in a course of conduct that constitutes unfair and deceptive practices when they knowingly used or employed deception to induce and encourage plaintiff to enter into

the reverse mortgage, promised performance which defendants did not intend to perform or knew would not be performed, and delivered and obtained plaintiff's loan check through intentional fraud and deception.

114. After Diamond and United failed to substantially perform as promised, they also failed to return plaintiff's money.

115. Diamond and United also made false statements to plaintiff in an attempt to excuse their non-substantial performance.

116. Diamond and United failed to employ the qualified personnel necessary to perform the home repairs.

117. Diamond and United failed to comply with municipal, county, state and federal regulations or codes relating to the performance of home repair, including obtaining appropriate building permits. In addition to being deceptive, defendants' practices violate public policy, are immoral, unethical, oppressive or unscrupulous, and substantially harm consumers like plaintiff.

118. Defendants' conduct violated ICFA (815 ILCS 505/2), by engaging in unfair and/or deceptive acts and practices and conduct toward plaintiff.

119. Defendants and their agents/co-conspirators profited from their fraud, deception, discrimination and/or negligence.

120. Defendants were unjustly enriched by their conduct.

121. Defendants engaged in such conduct in the course of trade and commerce.

122. Defendants engaged in such conduct with the intent that plaintiff rely on their deception.

123. Defendants engaged in such conduct with the intent to injure plaintiff.

124. Plaintiff has been damaged as a result and continues to be damaged.

125. Defendants' conduct caused plaintiff's injuries.

126.    Pursuant to ICFA, 815 ILCS 505/10a, plaintiff is entitled to actual damages, punitive damages, and attorneys' fees and costs.

WHEREFORE, plaintiff requests that the Court enter judgment in her favor and against defendants for actual damages; equitable relief; disgorgement of profits; punitive damages; attorney's fees, litigation expenses and costs; and such other or further relief as the Court deems appropriate.

## COUNT III - CIVIL RIGHTS ACT

127.    Plaintiff incorporates paragraphs 1-126 as if set forth fully herein.  This claim is brought against Diamond and United, and Bohn and American Fidelity (collectively, "defendants").

128.    In connection with plaintiff's loan transaction, defendants purposefully discriminated against plaintiff on the basis of race.  They targeted, singled-out and exploited plaintiff because of her perceived vulnerabilities, including her race.

129.    Through marketing techniques and other practices, defendants had a policy of intentionally and disproportionately targeting African-Americans on the south and west sides of Chicago, like plaintiff, with mortgage loans whose terms are less favorable than the terms given to similarly situated Caucasian borrowers, in violation of 42 U.S.C. § 1981.  Diamond and Bohn created and carried out these practices on behalf of United and American Fidelity.

130.    Through door-to-door marketing techniques and other practices, defendants had and have a policy of intentionally and disproportionately targeting African-Americans on the south and west sides of Chicago, like plaintiff, with home repair contracts for incomplete, shoddy, defective and dangerous home repair work, in violation of 42 U.S.C. § 1981.  Diamond and United have a long-standing pattern and practice of such conduct that is documented in other

lawsuits and in consumer complaints lodged with state and federal agencies. On information and belief, Bohn and American Fidelity were aware of this pattern and practice.

131. Plaintiff was qualified for reverse mortgage loans and home repair contracts.

132. But both the mortgage and construction contract transactions were arranged, granted and performed on grossly unfavorable terms to plaintiff.

133. Diamond does virtually no business with non-minorities, preferring to target elderly African Americans almost exclusively for his fraudulent schemes. On information and belief, Bohn and American Fidelity arrange mortgage loans on better terms for Caucasian borrowers.

WHEREFORE, the Court should award plaintiff compensatory, punitive and other appropriate damages; equitable relief; attorney's fees and litigation costs; and such other or further relief as the Court deems appropriate.

## COUNT IV – FAIR HOUSING ACT

134. Plaintiff incorporates paragraphs 1-133 above by reference herein. This claim is brought against Diamond, United, Bohn and American Fidelity (collectively, "defendants").

135. The Fair Housing Act ("FHA"), 42 U.S.C. § 3605, provides:

Discrimination in residential real estate-related transactions

(a) In general. It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

(b) "Residential real estate-related transaction" defined. As used in this section, the term "residential real estate-related transaction" means any of the following:

(1) The making or purchasing of loans or providing other financial assistance--

(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or

(B) secured by residential real estate.

(2) The selling, brokering, or appraising of residential real property.

(c) Appraisal exemption. Nothing in this title prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status.

136.    In connection with the subject loan transaction, defendants impermissibly and intentionally discriminated against plaintiff solely on the basis of her race, color and sex by targeting her for unconscionable financing and fraudulent, grossly overpriced home repair contracts paid from the reverse mortgage.

137.    The use of some other policy or practice would have satisfied any legitimate business need claimed by defendants.

138.    In the alternative, defendants targeted plaintiff because of her perceived vulnerabilities, including her status as African-American, elderly and female.  In particular, Diamond was aware that his policy and practices resulted in an adverse disparate impact on people like plaintiff and did nothing to correct that effect.

139.    Pursuant to the Fair Housing Act, 42 U.S.C. §3613, plaintiff has a private right of action for actual and punitive damages and injunctive relief.

WHEREFORE, the Court should award plaintiff compensatory, punitive and other appropriate damages; equitable relief; attorney's fees and litigation costs; and such other or further relief as the Court deems appropriate.

## COUNT V  --  CIVIL CONSPIRACY

140.     Plaintiff incorporates paragraphs 1-139 above by reference herein.  This claim is brought against Diamond, United, Bohn, American Fidelity, Primary Title, and Dennis Both ("defendants").

141.     Defendants, and each of them, conspired and agreed to steal the equity in plaintiff's home by fraudulently inducing her to sign a reverse mortgage and thereafter obtaining the entire "cash out" loan proceeds without providing commensurate services in return.

142.     Defendants, and each of them, knew that Diamond and United had no intention of performing construction or home repairs worth anywhere near the amounts obtained from the reverse mortgage.

143.     Each of the defendants participated personally in the fraudulent conduct and/or furthered the scheme to steal plaintiff's home equity, by various means, including but not limited to, (a) making direct misrepresentations to plaintiff (Diamond); (b) misrepresenting the import and effect of documents when plaintiff signed them (Diamond, Bohn and Both); (c) failing to provide copies of signed documents to plaintiff until after her three-day cancellation period had run (Diamond, Bohn, American Fidelity, Primary Title and Both); (d) remaining silent while other members of the conspiracy were making misrepresentations to plaintiff (Bohn and Both);  (e) facilitating the fraudulent transfer of loan proceeds (Dennis Both); (f) obtaining and fraudulently endorsing loan proceed checks without plaintiff's knowledge (Diamond); and (g) intentionally failing to perform the promised work, or causing substandard work to be performed (Diamond and United), as set forth above.

144.     On information and belief, defendants shared the fraudulently obtained loan proceeds.

145.     Plaintiff suffered damages as a result of defendants' fraudulent conspiracy.

WHEREFORE, the Court should award plaintiff compensatory, punitive and other appropriate damages; equitable relief; costs; and such other or further relief as the Court deems appropriate.

## COUNT VI -- BREACH OF FIDUCIARY DUTY

146.    Plaintiff incorporates paragraphs 1-80 and 90-126 above by reference herein.  This count is brought against Primary Title and Urban, only.

147.    At all relevant times, Primary was acting as the agent of Urban, the lender, in the plaintiff's mortgage transaction.  Urban authorized and instructed Primary Title to handle all documents, make all required disclosures, obtain the borrower's signatures necessary to consummate the loans, and disburse the loan proceeds properly.

148.    Primary Title appointed and authorized Dennis Both to act as closing agent/notary to handle documents, make all required disclosures, and obtain the borrower's signatures necessary to consummate the loans.

149.    The actions of Primary Title were taken with the actual and apparent authority of the lender, and thus, Urban is liable for the title company's conduct.

150.    As closing agent for the lender, Primary Title was under a duty to obtain plaintiff's signatures on the loan documents properly, to notarize and confirm her acceptance of the transaction, and to disburse the loan proceeds properly.

151.    In agreeing to act as the closing agent for the subject mortgage loans, defendant Primary Title also undertook the duties of an escrow agent for both parties to the loan transaction, and therefore became a fiduciary of the plaintiff in the transaction for the purpose of making the loan disbursements.

152.    As escrow agent for the disbursement of loan funds, Primary Title had a duty to the plaintiff-borrower to properly disburse the loan proceeds.

153.    The loan documents provide for certain sums to be disbursed to the plaintiff.

154.    Primary Title breached its fiduciary duties to plaintiff by making improper disbursements, either pursuant to a fictitious letter of direction, with no direction, or contrary to plaintiff's actual direction.

155.    Primary Title wrongfully disbursed the loan proceeds to the broker and/or contractor before any work had been done.

156.    In the alternative, Primary Title negligently disbursed the loan proceeds to Diamond and/or United without obtaining plaintiff's actual authority and without verifying plaintiff's directions with respect to the funds.

157.    On information and belief, based on the fact that plaintiff was unaware that funds would be disbursed to Diamond or United, did not have a contract with Diamond or United, and/or did not knowingly sign any letters of direction, Dennis Both acting as agent for Primary Title knowingly participated in the fraud, and obtained plaintiff's signature on purported letters of direction by deceptive means, and Primary Title accepted false letters without confirming them with plaintiff.

158.    Primary Title also intentionally and negligently breached its duties to Urban and plaintiff by allowing Diamond and/or Both to close loans on behalf of Urban, without having an employee or representative of Primary Title present at the closings.

159.    Plaintiff suffered actual damages as a result of Primary Title's breach of fiduciary duties.

    WHEREFORE, plaintiff requests that the Court enter judgment in her favor and against defendants, and award the following relief: actual damages, including but not limited to full

disgorgement of all fees received by Primary Title and restitution of all funds wrongfully disbursed, punitive damages, costs of suit, and such other and further relief as the Court deems appropriate.

Respectfully submitted,


s/Kari A. Beyer

Kari A. Beyer/ ARDC #6291397
312-347-8349
Michelle A. Weinberg/ARDC #6210390
312-347-8363

LAF
120 S. LaSalle Street Suite 900
Chicago, Illinois  60603

## JURY DEMAND


Plaintiff respectfully demands a trial by jury.




## NOTICE OF FILING AND CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

I, Kari Beyer, attorney for plaintiff, hereby certify that on April 9, 2014, filing and service of the foregoing document was accomplished pursuant to ECF as to Filing Users, and certify that I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.

s/Kari A. Beyer